The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Good afternoon, Mr. Schmidt. Can you hear me? I can, Your Honor. Thank you. Mr. Somerville, can you hear me? I can, sir. Thank you. All right. We'll proceed in the next case, Knight v. Boehringer Ingelheim. And Mr. Schmidt, we'll begin with you. Thank you, Your Honor. May it please the court, Paul Schmidt for appellant. When the trial court held that at the close of evidence that claims regarding the medication guide were preempted, a ruling that's not challenged on appeal, that should have ended the case for several independent reasons. And I'll focus on those reasons in my argument subject to questions the court has, and in particular, the fact that there was no evidence or sufficiency of the evidence argument. There was no evidence of any form of reliance on anything beyond the medication guide to support the verdict. Before turning to those arguments, though, I just want to touch for a moment on how important the medication guide was in this trial, because that drives our other arguments, particularly our sufficiency of the evidence argument. Because of the unique status of West Virginia law at the time of this trial, where unlike every other state, West Virginia did not follow the learned intermediary doctrine and focus on warnings to doctors, but instead focused on warnings to patients. This case involved a very intensive and direct focus on the medication guide. That was the only warning material that Mrs. Knight received and read. There's no dispute in the record about that. And that was the only warning material under federal law that she was intended to receive. The only FDA-regulated material under FDA law. That was the focus of the trial from opening statements through closing argument. In opening statements, the jury was told by Mrs. Knight's counsel, this is where the warning issue comes into play. Mr. Schmidt, if I could interrupt you, I apologize to that. But I understand that argument, I think. But why is that any different than any case that you have, a plaintiff has a variety of theories, they lose a directed verdict on maybe all but one, and they were kind of placing their focus on one of the theories to which they were subjected to a directed verdict ruling. The fact that you put more of your eggs in one basket doesn't mean you can't go to that last basket. Even if there's, the question really is whether that last basket is sufficient. So I appreciate what you're saying about that, but I don't understand why it is really all that determinative in our appeal. Sure, I think it's a couple of reasons, Your Honor, and then I will turn to the sufficiency point that Your Honor raised, because that basket is entirely empty in this case in terms of the record on that issue. But in terms of the first argument we did make, which I think is what Your Honor was referencing, that the preemption ruling on the medication guide should have ended the case, it's because of the way they tried the case, it's because of the fact that the medication guide did contain warnings relevant to this issue. It warned of bleeds, it warned of age, it warned of kidney function, it told patients to talk to their doctor about their other medications. It's just impossible in that setting, and it turns preemption inside out. It disregards it to say you can ignore all of that and claim an omission somewhere else without inherently considering what happened in this whole trial, which is the focus on the medication guide and what the medication guide did and didn't say. That's, I think, the answer to Your Honor's question. One of the things that isn't really before us, I guess, is the trial to allow the discussion of the medication guide in closing arguments. Let me just make sure I understand that. That doesn't appear to be before us. Am I correct about that? That is correct, Your Honor. What's before the court is arguments that the medication guide ruling should have ended the case. The first is just as a matter of preemption, as I was mentioning. The second is what Your Honor referenced, sufficiency of evidence beyond the medication guide, and that's what I want to spend some time talking about. There was no evidence in this record of reliance on anything beyond the medication guide, such that even if there was a claim that could survive, even if hypothetically there could be another basket, that basket didn't exist here because there was no support in the record for the two items they claimed to have indirectly relied on, the physician warnings and the television advertisement. In terms of the physician warnings, their claim was this monitoring claim. They never linked it up to Dr. McFarland in terms of it being a meaningful reliance point for her, the omission of that information being meaningful to her in terms of what she relied on, or, in turn, that translating through to Mrs. Knight. And I want to emphasize how easy that would have been for them to establish and how glaring that absence is in the record. The court can take notice of a legion of pharmaceutical product liability cases, even other Pradaxa cases, where the case centers on questions just like this that are asked to the doctor. Would it have been meaningful for you to have been given this information? Would that have changed your decision to prescribe the medicine?  All questions relevant to the showing of reliance, none of which exist on this record. They never asked what influenced Dr. McFarland's decision to prescribe. They never asked what she relied on in prescribing the medication. They never asked for details about her actual discussions with Mrs. Knight so that they could establish the level of confidence. Can I ask you a question? There is an order issued by the court on the motion for summary judgment, and in the order issued by the court, the court describes the medical condition of the plaintiff, the fact that she was, in fact, tested three times for coagulation timing, and it all fell within the median range of appropriate. I'm never bringing into account the 80-second boundary. Was that part of the record? The court referred to exhibits in the summary judgment. Were they put before the jury? I believe they were. I'll confirm on the break and give a confirming answer on my rebuttal, but I believe they were. The district judge laid out the facts from those, and it's somewhat telling. Number one, the first thing was she was prescribed the 25-milligram, which was to accommodate the renal condition, and when she did bleed, the doctor said it was because of a deformed vein or artery that he went down and clamped. They clamped it, and then a few days later, they put her right back on to Pradaxa, aspirin, and another blood thinner called the triple therapy, and she went on that for several months, and they tested her again, and she still came in within the range. And then in September, they tested her again for her coagulation timing, and she came in at 54, 52, whatever it was, which is also in the median range. So if that's part of the record, the question I would have is how is anything that's being argued material if, in fact, she was monitored and if, in fact, all her readings were well below the 80 that she complains about? She was given the 25-milligram, the low level that was recommended by the FDA for people with renal vulnerabilities, and you sort of wonder not only is there not reliance, there's a question of materiality, isn't there, which is required under fraud in West Virginia? Yes, Your Honor, and I think those issues intertwine on this question. I suspect the plaintiffs would argue that she should have been monitored more. She wasn't monitored enough, but that is- That's three times from May to September. Yes, that becomes a pretty speculative claim, and when the only facts we have are that the tests that were done didn't impact anything either in terms of their levels or in terms of the doctor's decision, as Your Honor pointed out, that does go to a fundamental lack of evidence to support any kind of reliance because there's nothing to rely on that was an omission that mattered in any sense or, as Your Honor pointed out, materiality. That's a glaring absence- Mr. Schmidt, can I follow up on the- Excuse me. Can I follow up on the reliance question because- Mr. Schmidt. As I understand it, the reliance issue here is not a direct reliance on the part of the patient, but an issue of indirect reliance with the physician presenting information to the patient that she, in turn, would have relied on. And Judge Copenhaver, in his post-judgment order at page 7, says, and I'm quoting here, because there was evidence that medical professionals reviewed the physician label as they consulted with the plaintiff, defendant's reliance argument must be rejected. But what about that do you take issue with? Well, I think that's reading reliance out of the law. It's a truism that doctors read the label. They're supposed to read the label. That's basic medical practice, reading the label. But that doesn't show reliance on a specific omission. And the case law, West Virginia case law, on this question, the Quicken Loans case we cite as a good example of this, is clear there's got to be actual reliance on a specific omission where correction of that omission would change what happened here. And that's the absence of evidence. We know that the doctor looked at the label. So you think in this case, and I think you said this earlier, that it would have been incumbent, required, necessary for the plaintiff to present evidence in the form of the doctor's testimony that, indeed, if I had received this particular information regarding the need for monitoring, if I'd been advised of that, that would have colored my view as to whether or not this medication was appropriate for the plaintiff, that kind of testimony. Yes, or it might have affected how I talked to the plaintiff about the medication in a way that would have influenced the plaintiff in some way. None of that is present here. Those are really straightforward questions to ask. They appear throughout the case law. They weren't asked here because I think, as Judge Niemeyer pointed out, they're at odds with the facts, the real-world practice that happened here in terms of Mrs. Knight, in terms of her medical needs. So can I just follow up on that? So that's just a common-law deficiency in the evidence. It has nothing to do with this separate question of preemption, I suppose. But I do have a question about preemption with respect to the physician's label. And it seems I've looked, but I don't know that the district court judge ever engaged on the question of preemption with respect to the label as opposed to the medication guide. Am I missing something there? Wasn't he required to make a finding as to whether or not preemption applies to both of those things? Yeah, I think the record is a little confusing on this point. The trial court judge did address preemption arguments in the context of the physician label, but didn't fully resolve them in a way that I think is pretty clearly required by post-decision Supreme Court guidance, specifically the All-Riley. Well, as I understand it, right, he made a finding as to the fact that this information regarding the paper, the Riley paper, was newly acquired information. And I know you take issue with that, and we can talk about that. But can you point me to where he then closed the loop on whether or not that information would have affected the FDA's approval of any change in the label? That seems to be missing. I don't see that here. Your Honor is exactly right. That's our core argument. That is missing. It didn't happen. And that's where we think the district court stopped a little short. So he did issue a preemption ruling, as we understand it. He did make a finding that there were new analyses, and I think there were new analyses. That's not a disputed point. But Your Honor put your finger on exactly the issue when it comes to preemption as to the doctor warning that he didn't make the required finding under the regulation. Under the regulation, he has to find newly acquired information. That means something that shows a different risk or severity or frequency than what the FDA already knew about. He didn't reach that finding. The Pradaxa decisions that we've cited to the court that weren't available at the time, the unanimous five decisions that have addressed this issue post-Albrecht, they've all grappled with that issue, looking at the same evidence as the trial court did here, the district court did here. Every one of those decisions has rightly found there is no newly acquired information because while Beringer – yes, Your Honor. Finish your answer. I want to hear the rest of that, but I'll come to you when you finish. Okay. While Beringer did continue to study the medicine, the results of that study always told the company the same thing, that this monitoring didn't make sense. It told the company the same thing the FDA had concluded, which it concluded before approving the medicine and then just two years ago in the scientific literature, that the plaintiff's theory in this case wasn't scientifically supported. So, Mr. Schmidt, I want to follow up on that. In the post-trial motion, at least, the court said that the preliminary conclusion in the draft paper and the email exchanges rose to the level, I think, of newly acquired information. And it seems to me that begs the question of what's the standard there? I mean, it's hard for me to tell if the district court is saying there's evidence of newly acquired information, therefore it's kind of up to the jury, or I've fully grappled with the issue and what level of actually revealing a new risk. Can you help? It seems to me, after Albrecht, that's a question of law. Yes. And can you just give us your position on how we analyze that position or how the district court? I know you think it wasn't, but kind of go through a little bit of analysis, please. Of course. I think it's a pretty straightforward question, determining what constitutes newly acquired information. It's the definition in the regulation governing the CBE label change, the way that companies can unilaterally make a CBE label change and, therefore, preemption can be avoided. And that regulation defines newly acquired information as 21 CFR 314.3b. That regulation defines newly acquired information as something that, quote, as analyses that, quote, reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA. So what the court will see in those five post-Albrecht productive decisions, every single one of them analyzes that question. The judge here did not. He just found new analyses without finding if it's different. And then he also, I think, Your Honor, touched on this question as well. I'll use my last bit of time for this. He also didn't resolve factual questions. In fact, he did the opposite. He said the suggestion of a factual question means we lose on preemption. He didn't have the benefit of Albrecht. Albrecht tells us he has to resolve those. So it was those two issues, not finding whether the new analyses changed things and not resolving the factual questions to determine the issue himself. All right. Thank you, Mr. Somerville. We'll hear from you. Good afternoon, all. May it please the Court, my name is Darren Somerville. I appreciate you giving me the opportunity to speak to you from Atlanta today. Let me take the preemption issue first. The reason why there are no detailed findings in terms of the two prongs of the preemption analysis is because both were conceded by counsel for the defendant. If the court takes notes in pen and paper anymore, the red star goes on page 1710 of the Joint Appendix. And that's in where this is actually the colloquy with the court between defense counsel where the judgment as a matter of law is being argued. And although I don't love just reading at it, but I do think the language is so dispositive. Mr. Lewis, speaking on behalf of the defendant, explains when the judge presents the question, well, what about these new studies, this new literature like the Riley paper but not limited to it? And also this internal colloquy between all of the individuals at the defendants about whether or not plasma concentration monitoring should be revealed to the FDA. And he says, wouldn't that be enough to sort of trigger the notion that there is new information out there that would allow a change under the so-called CBE process, the changes being effective process? That's something that is routinely used to change labels at the manufacturer's doing because it's the manufacturer's responsibility to do just that. In other words, to win preemption, they have to win that it's absolutely impossible for them to comply with their state court duties. Mr. Lewis, in exchange... Yes, sir. Go ahead. Go ahead. You're getting to what I was going to ask you to get to. Go ahead, Mr. Sullivan. I'll get there faster. So Mr. Lewis conceded right out that, first of all, that I've got to be honest with you. That's his quote, not mine. We definitely have an approved FDA label that didn't require monitoring. We have some new analysis that was done. There's no question about that. That is the first point of the preemption analysis. In other words, we have a judicial admission from the individual chosen by BI to speak on their behalf. But let me stop because I spent a good bit of time with that part of the transcript. And I think a couple of things are significant. I mean, one is all that's happening pre-Albrecht. Yes, sir. And they are talking about that, it looks like to me, as if there's a question of fact or not. They're not really addressing the issue of weighing the evidence and come to a conclusion, which I don't fault them because it's pre-Albrecht. But after Albrecht, and I don't think they ever really concede. I think they concede there's new studies. I don't think they ever concede that those studies do what the reg provides, which is reveal a risk of a greater magnitude or greater severity. I'm butchering the language a little bit. But so I don't think there's any question that there's additional studies on the data, which is the type of thing that can be newly acquired evidence. But I think it's the type of the studies reveal that increased risk. And I didn't see a concession on that point. I just heard maybe there's a question of fact about it. Well, under Albrecht, all that decision does just is put the preemption decision in the hands of the judge rather than the jury, of course. And while the colloquy starts out and talks about the notion of a fact issue being involved, of course, that's going to be inherent with any judge's disposition of the preemption issue because he has to make a determination as to whether or not there is new information to begin with. In other words, there has to be some sort of evidence of what that information is. And in this case, we not only have that concession. And I'll wrap this together. The second concession, this equally is important because keep in mind that B.I. has to win both prongs of the preemption analysis, is that he says that they don't have kind of slammed up at the FDA for that change. That's also on page 1711 of the joint appendix. In other words, he says that. Mr. Somerville, I'm sorry. Mr. Somerville, we kind of lost you on that, the first part of that. Yeah, the signal's breaking up. Could you repeat that again? The signal's breaking up. I will. I will do my best. And so there are two parts to the preemption analysis, of course. The first part is whether or not there's new evidence or information or analyses, of course, as the judge was relying on, based upon the non-computer modeling of the RELY study. So the second part, though, is whether or not the FDA would have clamped down and said, even if B.I. had suggested this labeling change, they would have rejected it. In the same colloquy, on page 1711 of the joint appendix, Mr. Lewis explains they don't have that evidence in this case. They don't have the evidence that the FDA would have rejected that. And that's not surprising because we know the exact type of evidence and the exact type of label change that we suggested should have been made from the outset, from the early 2010, if not before, on the initial label, were the CBE changes that were made. Was there evidence? Go ahead. Go ahead. Just real quick, I want to make sure I understand that. Is it your position that if there is not – you said there's two prongs that the defendant must meet, and that's what I'm trying to make sure I understand. Hypothetically, if we were to decide that there is not newly acquired evidence, doesn't that end the preemption issue? If I miscommunicated that, then I agree with you. It is an affirmative defense. We know that from the Wythe case, and we know it's a difficult defense, as the Supreme Court put it. So there is a split in at least the district courts. I will say that. We're not going to rely on it. There is a split in the district courts as to whether or not there is any sort of burden shift to begin with. But – So my point there is that if – I think – I look at it – I thought there were two alternative ways of getting to preemption. The first is if there – is there or is there not newly acquired evidence? If the answer is no, there's preemption. If the answer is yes, there is newly acquired information. Then the defendant can still show preemption if it can show that the FDA would not have approved that additional labeling. But if it's not newly acquired evidence, we don't get to that second question. So from an analytical standpoint, am I right about that? I would agree. I was speaking from the standpoint of once the counsel concedes on the record that there's enough evidence that this would have demonstrated new evidence, not only from the Riley study, but from the iterations of it that kept changing over the years, but also the emails. And that's something that's a little different than some of the other cases. Now I will concede that the evidentiary record in some of the other cases that have been suggested to the court are not entirely clear. In other words, it's unclear whether or not those trial courts have the same evidentiary record that we do. And I don't want the court to overlook the importance of some of these electronic mail communications between the various BI defendants. For example, the one that's probably the most telling to me is on page 532 of the record. 532. And it is from Dr. Heinrich Knowles. Of course, this was in evidence, and the jury had it before them, as well as, of course, the judge did when he was evaluating it and made note of it anapolically about the new information that was available. And that email indicates that essentially this doctor's almost apoplectic state of the notion that the Riley paper is even going to be published. Because, as she writes, the drug was developed with a clearly defined target of no monitoring needs. And remember, that's sort of the mantra that we believe supports the punitive damages evidence as well. A prospective trial without plasma blood monitoring was performed, generating the RELY study results. We promoted two fixed doses without monitoring. We defended continuously to health authorities that individual patient characteristics do not allow a dose titration based on plasma level only. And now she suggests that if we go ahead with the Riley study, this will make any defense of no monitoring to health authorities extremely difficult and undermine our efforts to compete. That is the new evidence, the new interpretation of the Riley study that was absent back in 2010. Was the Riley study submitted to the FDA? The RELY study, yes, it was. The Riley paper is one that is just simply published in the journals after many iterations. So we know now, and we know because the FDA couldn't have approved the dosages for people like Betty Knight, who had real creatinine clearance issues, simply because there weren't individuals in the study that had those conditions. Once they were at that clinical threshold... Mr. Somerville, can I ask a question about the email you just read? Is it your view that anytime a doctor or scientist might call into question a previous study or paper, that that would automatically require some sort of action on the part of the drug manufacturer to consider whether it's newly acquired information and, if so, put it on the label? That can't be right. No, I would agree with you. I'm not arguing that broad an interpretation. What I am saying is this doctor was one of the key figures on the clinical side of the Riley paper, and this is a historical account of what happened. That's not the only thing, of course. There are all others on pages 513 of the record, for example, 915, 916, all that talk about this new concept that plasma concentrations can be adequately measured and then that there are going to be subclinical doses, as to what was on the market, that could perhaps be helpful to people like Betty Knight, but it might not, and that the risk probably outweighed that. For example, that the risk of a gastrointestinal bleed was much worse on Pradoxa in these vulnerable subgroups of the population. So, Mr. Somerville, just on that same point, I grant you that there's some e-mails that suggest there's a viewpoint that you're expressing and that the preliminary conclusion in the paper are consistent with what you're saying. I guess I'm trying to figure out, you know, the ultimate conclusion in the paper was that there was no optimal concentration level, and if that's the ultimate conclusion, aren't you kind of required to show that that conclusion was, you know, a sham in some way? And I get you have an argument for that and made it effectively, you know, in front of the jury, but isn't that the real question? If there's a conclusion that there's no optimal range, then there's no newly acquired evidence of a different risk. And so it seems to me you have to, the judge would have to decide as a matter of law that they actually reached a different conclusion and essentially published a false paper. Am I, is that correct? I would respectfully say no, and here's why. That's probably true. Tell me why. Well, I don't make a career of disagreeing with judges. It's a self-limiting job. But what I would say is this. I mean, for example, we know there are multiple iterations of the Riley paper, and we know that there's an evolutionary trend that's demonstrated in these emails starting back in 2010 that, hey, never really intended there to be monitoring. We can't have monitoring. So the paper kept changing and changing, and even the authors, even though the people who were writing the paper wrote the paper, the authors ultimately became essential. There was an internal communication that people at BI wouldn't be able to sign on because that didn't match the values of the company because they had always said we can't have monitoring. And would the jury be entitled to say this paper is a sham? Maybe. Or would the judge? Maybe. But I would say that it demonstrates. Mr. Somerville, can I follow up on that? So isn't the problem here that, you know, we're engaged in this, I guess, sort of a little bit more nuanced discussion of the various iterations of the paper and the emails that preceded it. But the problem is that the district court didn't engage with that analysis, right? It just kind of left it to the jury to figure out, and that doesn't seem to be right anymore. I don't believe there was a jury finding on preemption, Your Honor. Well, but shouldn't someone have found? I know your first point is they conceded it, but if we don't agree with that, then isn't the remedy for it to go back to the district court to figure that out? Or perhaps we can figure it out since it appears to be a, well, I don't know, it's a question of fact, I guess, and law. But someone has to figure that out, and I don't know that someone has. I'm not certain about the second half of your question as to whether or not this court could do it. My first line of answer is the trial court did. While he did not engage in a detailed determination, let's say, for example, B.I. had come into the room and said on that first prong of preemption, we absolutely concede there was new evidence that would justify a change. That's a judicial admission. I think that would waive any requirement that the judge make that. That's our position is exactly what he did because he goes through this colloquy and says over and over, now, Mr. Lewis, you acknowledge this. You acknowledge that. Never is there an objection. Never is there a sort of re-correction or re-direction of the judge. And at the end of that colloquy, the judge says, here's how I rule on the JMOL motion. I find that the preemption applies to the medication guide, but nothing else. Because he thinks, or as the judge I think correctly found, the CBE process would have indeed given that sort of green light to B.I. in this situation. And we know that because they did. They actually submitted several times before, sorry, label changes, before and after Ms. Knight began taking the medication. We know that the evidence in this record. I'm sorry. No, go ahead, Judge Diaz. I was just going to say, is there anything in this record that indicates that the district court equated that colloquy that you talked about to a judicial admission in court that relieved its obligations to make that finding? I don't know that the words judicial admission. I do know that in three different places after that discussion, the court extends another question to counsel and says, now you've acknowledged there is enough evidence on this prompt. And there's no quibble, no quarrel with that. And then, of course, there is a written order, albeit a succinct one, rejecting the judgment as a matter of law on the preemption issue. So those are the two places that I believe it appears in the record. And I would also say, for that matter, nowhere in the subsequent post-verdict briefing is there anything about, there's no indication about lack of new evidence because the Riley paper was in the record, all iterations of it before the jury, and this is the evidence that the judge had in front of them. Keep in mind also, and this goes to Judge Niemeyer's question ultimately on summary judgment, this was an issue on summary judgment on the other preemption issues that the judge denied, and then it wasn't raised again. Mr. Somerville, before you run out of time, I guess you've got a little bit more time than I anticipated, I'm curious about this issue of the reliance question and what proof would have been required in terms of indirect reliance. Your colleague seems to suggest that you would have needed to trot out the doctor to say, you know, I would have, had I known this information, it would have been important to me and I would have relied on it. And it doesn't appear that that was in the record, but why do you think the record is sufficient on the question of reliance? I am not sure I agree with your honor on that. We put Dr. McFarland on the stand. That's Betty's position. She is straight as an arrow, says that she relies upon labels. If she had known about the label or if she had known about plasma concentration issues, then she would have informed her patients. The flip side of the reliance argument is that both of the plaintiffs in this case are Ms. Knight's surviving children. Both testified at trial and both said that Ms. Knight was the type of person, but with empirical evidence, I might add, who did read what she was given and did follow those sort of commands. So I think, albeit circumstantial, I mean, that's all we have. Ms. Knight is no longer with us. That's plenty for a jury to get to and to get to the reliance issue. And keep in mind the reliance issue here isn't one of omission. In other words, it's the defendant's obligation to inform physicians. We know that. That was conceded across the board. Their entire argument strategy in the closing was take a look at the physician label. Take a look at those and see. And it encourages people both in the medication guide and otherwise. It encourages patients to talk to their doctors. Mr. Stone, if I could kind of follow up on this reliance. When she was first prescribed the drug, the original physician's label was the one that was out. And then the month after she initially started taking the drug, the revised label came out. And so presumably that is in the hands of Dr. McFarland from that point forward. And they go on for almost a year and a half, I think, before she unfortunately dies. What's the effect of the revised or second physician's label? I know you have a criticism of that, that it doesn't deal with monitoring. But put that aside. Does that break the causation chain in some way? It seems like it addresses most of the complaints you had. And once the doctor has that, is it fair to utilize indirect reliance at least on anything in that second label? Thank you. The answer to your question is does it break the causation chain? My answer is no. And here's why. There are many things that were faulty about this label. For example, the European label changed after all of that. And yet still that did not influence the BI's decision to change the label here. Now, there were other things, of course, that were important. And our whole argument, and the one particularly that affected the trial court's thinking, was that this monitoring issue is really the issue. And recall Betty Knight had been on Coumadin for years. And with no problematic effects, it only affected her diet in a way that she did not care for. And it required constant monitoring. And that's why she chose the more efficient Pradaxa product. If that had not been the case, in other words, I think if she had been told, I think it's, again, although circumstantial, it's not an unjustifiable leap at all to say that she would not have taken the medicine, given that she had a track record of success with her earlier anticoagulant. If the only differential between Coumadin and Pradaxa is lack of monitoring, and really for vulnerable patients like Betty Knight there needed to be monitoring, then I think the jury could have concluded that she never would have taken it. What's the evidence in the record that had they suggested that monitoring would have been useful, that she would have still rejected it? In other words, in this case, the monitoring that was done indicated continuation of the Pradaxa. Every reading was well within a safe range. It wasn't at the 90% range. And she was taking the lower level that the FDA determined from its model was safe with people with renal vulnerabilities. And so my question is, so they say it's good to monitor, and they in fact did some monitoring, and she never even came close to levels where they would have stopped using the medicine. Two things then, Your Honor, and I'll be succinct in my answer because I realize my time is over. But for one, the FDA's sort of blessing on the issue, of course, was colored by the notion that the Rely study was one that actually assisted with vulnerable people like Betty Knight, who didn't have creatinine clearance above 30 and never should have gotten the drug in the first place, at a 75 milligram level. Maybe there's a therapeutic dose that would have helped and reduced her risk of stroke or anticoagulation or coagulopathy disorders. But as the defense witnesses testified at trial, there's no evidence that there's a safe level for people like Betty Knight. And the second answer to your question is, again, we're going back to the notion of what kind of patient Betty Knight was. And the evidence was uniform from both of her children and her doctor that she did pay attention to these issues, unlike, say, many of us. But she did read labels. She did adhere to doctors' instructions. And she even discontinued medication. She found that there was essentially a bad side effect. And that evidence taken, although, again, circumstantially, because Ms. Knight's no longer with us, I think would be more than enough for a jury to conclude that she relied on the absence of that warning from her doctor, a doctor that she had been with for some time, that she trusted, and had always followed her directions. If there are no other questions, I've said my piece. I think it's time. Thank you. Thank you. All right, Mr. Schmidt. Can you unmute your ‑‑ I can't hear you. Is that better? Yeah. Is that better, Your Honor? Yes, sir. Okay, thank you. I'll address briefly newly acquired information and the preemption issue regarding the physician label and then the fraud reliance point. In terms of newly acquired information, my colleague concedes that it's required, that it requires some showing of a change in the understanding of the medication. And the argument that was advanced in support of there being newly acquired information was not actually any showing of a changed risk of the medicine, but this alleged concession, which is exactly the opposite. The alleged concession is we have some new analysis. There was new analysis. That's not enough under the regulation. It's got to change the understanding of the medication. There's no question about it. And I think there's probably a fact issue on whether there's newly acquired information. That's the opposite of a concession. Why do you say that's a fact question? I thought that's a law question for the court. Well, I think that's critical. Yeah. I think that's the critical point about the timing of this case. At the time of this case, the Albrecht decision was before the Supreme Court, and there was unsettled law as to whether factual disputes and preemption go to the jury or are decided by the judge. We now know, and I think that influenced the judge's decision below in relying on this statement that there was a fact issue. We now know post-Albrecht, that doesn't matter. The judge has to decide those questions. Judge Chambers didn't have the benefit of that law at the time he issued this decision. I think his decision would be different if he did, and that's a fundamental issue with this decision. It's a fundamental reason why the concession has no bearing on the post-Albrecht world. Mr. Schmidt, and I hate to cut into your short time, but Judge Diaz raised a point that I'd like your answer on. If we were to conclude that because of whatever reason, perhaps the state of law at the time, that the district court did not make a decision on preemption, but somehow that just kind of went to the jury in some fashion or the jury proceeded, is the remedy for us to decide that now, or is the remedy to send it back to the district court to make a decision? I think the proper remedy is that this court can decide it. At a minimum, it should be sent back if this court has questions, but because it is a question of law, I think it's a question that this court can decide, and it can do so on a record that's very clear, supported by a pretty uniform body of trial court case law. It's very clear that there is no newly acquired information here. The one document that my colleague focused on in that regard is remarkably telling on that point. It's an email where someone is saying, don't publish something that actually was published and submitted to the FDA, where after that was published, the FDA came out and said, there's no science supporting their monitoring position. That's a remarkable record in terms of preemption, where the one document they cite is a document saying, don't publish something that was published, and that after being published and submitted to the FDA, the FDA continued to say and publish scientific articles of its own. This isn't scientifically supported. That's why I think every court looking at this has found preemption is a matter of law in this record. That's why I think this court could find it too. Just a few points in terms of the reliance and the fraud claim. Judge Niemeyer, the records of the blood tests were in the record before the jury. For example, plaintiff's counsel introduced them with our expert witness. They came in in a few places. In terms of the doctor's reliance, I'll go back to what I mentioned in my argument, the Quicken Loans decision from the West Virginia Supreme Court of Appeals, where on page 656 of the Southeast Reporter, the court notes, makes a finding that it's not enough to show a misrepresentation. They have to show that, in this case, a transaction would not have happened but for the misrepresentation. And where that kind of reliance is lacking, as it is here, there's no evidence that this would not have happened. But for the misrepresentation, as Your Honor has pointed out, Judge Niemeyer, the record shows exactly the opposite. On that record, there is no evidence to support the heightened finding they need to show on fraud. And the plaintiff's own testimony reinforced that. They said, we don't remember the conversations. Ms. Stevens said, they asked Dr. McFarland, quote, if she thought it would be okay to change it, and she said yes, and there was no questions about that. She didn't question us or tell us anything else about the drug, just that you know they could try it. That's an absence of evidence by their own admission, J.A. 1678-79. Thank you, Your Honor. All right. Thank you. Thanks for your arguments. Fine arguments. Our practice on the Fourth Circuit is to come down and greet counsel, shake your hand in court. Neither one of you showed up in court, but we welcome you, greet you, and appreciate your arguments. We'll take this under advisement, and we'll take a short recess to reconstitute the next counsel. Thank you very much. Thank you, Your Honor. Fifth Honorable Court will take a brief recess.
judges: Paul V. Niemeyer, Albert Diaz, A. Marvin Quattlebaum Jr.